## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Chapter 11 |
| VEROBLUE FARMS USA, INC., | ) | |
| et al, | ) | |
| Debtors. | ) | Bankruptcy No. 18-01297 |
| --------------------------------------------- | | |
| VEROBLUE FARMS USA, INC., | ) | |
| et al, | ) | Adversary No. 19-09014 |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| JACKSON WALKER L.L.P., | ) | |
| Defendant. | ) | |

### RULING ON MOTION FOR PROTECTIVE ORDER

Defendant Jackson Walker L.L.P. filed a Motion for Protective Order and a
Motion to Dismiss. Jackson Walker has no substantive position on the discovery
issues but seeks direction from the Court on which parties—Plaintiffs as interested
parties—are entitled to documents and assertions of privilege. Dan Childers and
Robert Lang appeared for Debtors, VeroBlue Farms USA, Inc. ("VBF"), VBF
Operations, Inc., VBF Transport, Inc., VBF IP, Inc., and Iowa's First, Inc, and
submitted a brief in support of its claim. Parties in interest, Leslie A. Wulf
("Wulf"), John E. Rea ("T. Rea"), and James Rea ("J. Rea") were the original
founders of VBF. They will be referred to collectively as the "Founders." The
Founders submitted a brief in support of their claim that the Retained Preserved

Materials should be released to them.  This is a core proceeding under 28 U.S.C.
§ 157(b)(2)(A).

## STATEMENT OF THE CASE

Jackson Walker refused to turn over around 800 documents to VBF from
VBF's client files, asserting attorney-client privilege.  Jackson Walker refused to
hand over the documents after the Founders claim that they control the assertion of
privilege over the communications in question (related to the 2016 Stock Purchase
Agreement).  VBF argues that the Founders are asserting a privilege they do not
have.  VBF emphasizes the Founders were never represented by Jackson Walker.
Jackson Walker was counsel for VBF.  VBF further asserts that even if Founders
have a claim over the relevant communications related to the Stock Agreement,
many of the withheld documents are not related to the agreement, nor did they
include a Founder.  Founders assert that the 2016 Stock Purchase Agreement
addressed these issues specifically and under that contract.  They have the right to
that privilege.  After careful consideration, the Court concludes that Founders own
the Retained Preserved Materials except as provided in subsection "D."

## FACTUAL BACKGROUND AND ARGUMENTS

Jackson Walker represented VBF from around 2014 through sometime in
2018.  VBF paid Jackson Walker approximately $1,483,287.87 for its services.
VBF does not believe its relationship with Jackson Walker was formally

terminated.  It considers Jackson Walker to be its counsel.  Jackson Walker filed a

proof of claim when this bankruptcy was filed based on its representation of VBF.

On October 24, 2018, VBF's President requested Jackson Walker turn over

all VBF's client files.  Jackson Walker refused to turn over around 800 documents

asserting attorney-client privilege related to shareholder stock agreements.

According to Jackson Walker's privilege log, the withheld documents are from

March 20, 2015, through July 6, 2016.  See Jackson Walker Privilege Log,

attached to Compl. at A-4, (Dkt. 1, pp. 24-34).  The attorney-client privilege issue

related to whether the documents are owned by VBF or the Founders, and who can

assert the privilege.  VBF emphasizes that it paid Jackson Walker for its legal time

in processing the withheld documents—not the Founders.

VBF disagrees with Founders arguments that they, the Founders, own the

documents or control the assertion of privilege.  VBF argues the Founders should

not be allowed to assert privilege when they were not Jackson Walker's client.

VBF argues that even if the Founders have a viable privilege claim over the

communications related to the Series A Stock Agreement, many of the withheld

communications do not relate to the agreement.  VBF also argues that many of the

communications withheld do not include a Founder.

Jackson Walker is essentially refusing to turn over the Retained Privileged

Materials to Alder Aqua, Ltd.—the former controlling, shareholder and now the

sole shareholder of VBF.  Alder Aqua is pursuing litigation against the Founders in a pending lawsuit in the United States District Court for the Northern District of Texas for various misfeasance while managing VBF.  Alder Aqua seeks to use this information against the Founders in that suit.

The Founders started VBF and were among its original shareholders and officers: Wulf was the CEO, Hall was the CFO, and T. Rea was the COO and Construction Director.  Each at different times served on the Board of Directors. VBF is now under the exclusive control of Alder Aqua and is pursuing an action against the Founders in the Northern District of Texas.

The transactions in the documents at issue occurred in 2016.  In July 2016, Alder Capital International Ltd., ("Alder"), and FishDish LLC, an Iowa investor group ("FishDish"), together invested $34 million in VBF through a purchase of preferred stock.  On July 8, 2016, the transaction was documented in the VeroBlue Farms USA, Inc. Series A Preferred Stock Purchase Agreement ("Series A Agreement").  Alder also extended credit to VBF, through Alder affiliate Amstar Funds, in exchange for VBF issuing warrants to Alder that allowed Alder to obtain additional shares via a separate agreement ("Warrant Agreement").

Upon execution of that Series A Agreement, Alder owned 47%, FishDish owned 8%, and the Founders owned 22%.  In July 2017, Alder exercised its rights under the Warrant Agreement, resulting in Alder owning a controlling interest of

54%.  Thereafter, the Founders and many other non-management employees were

terminated from their positions.

In December 2017, Amstar sold VBF's line of credit, and VBF filed for

Chapter 11 protection in this Court.  Alder Aqua, Ltd., ("Alder Aqua"), an affiliate

of Alder, was approved by the Court as VBF's debtor-in-possession lender.  Alder

Aqua provided the sole source for reorganization funding.  Following confirmation

of the Chapter 11 Plan, Alder Aqua is now the sole owner of all equity in VBF.

VBF claims that all the documents and communications of Jackson Walker

during its representation of VBF from 2014 to present are VBF's property.  The

Founders argue that VBF is ignoring the several changes in ownership, and what

the specific provisions in the Series A Agreement say about the control of VBF's

evidentiary privileges.  The Series A Agreement status:

> Each Investor further agrees that, (i) as to all
> communications between the Legal Counsel and Parent,
> the Company, its Affiliates, and any Management Persons
> that relate in any way to the transactions contemplated by
> this Agreement and the other Transaction Agreement, the
> attorney-client privilege, the expectation of client
> confidence and all other rights to any **evidentiary
> privilege** belong either to the given Parent, the Company,
> Affiliate or Management Person, as applicable, and **may
> be controlled by such Parent, Affiliate, or Management
> Person, as applicable, and shall not pass to or be
> claimed by any Investor, the Company or any
> Subsidiary, and (ii) in the event the Company becomes
> an Affiliate of any Investor** or multiple Investors, as to
> all communications between the Legal Counsel and the
> Company, or among the Legal Counsel, the Parent, their

> Affiliates and/or the Management Persons prior to the Closing that relate in any way to the transactions contemplated by this Agreement and the other Transaction Agreements, the attorney-client privilege, the expectation of client confidence and all other rights to any **evidentiary privilege belongs to** Parent, or any specific **Affiliate or Management Person who receives a communication, as applicable, and may be controlled by such Person**, as applicable, **and shall not pass to or be claimed by the Company or any Subsidiary.**

Series A Agreement, Exhibit A, § 7.16 (Emphasis Added).

The Founders argue the Series A Agreement language stating, "'belongs to … [the Founders] and may be controlled by' them", and "any privilege over the communications between JW and Founders 'shall not pass to or be claimed by [VBF] or any Subsidiary,'" is clear and disposes of this issue.  They believe the Agreement proves any evidentiary privilege over all communications between Jackson Walker and Founders belongs to the Founders.  Founders brief at 5; Series A Ag., Ex. A, §7.16.  The Founders believe VBF is attempting to require Jackson Walker to breach the Series A Agreement, as well as the Texas Disciplinary Rules of Professional Conduct.

VBF asserts the Founders are wrong in analogizing Great Hill, a corporate merger case, to this one and note that two entities purchasing minority shares of stock cannot be compared to a merger.  VBF requests Jackson Walker to produce the files.

## CONCLUSIONS OF LAW AND ANALYSIS

The Founders assert the parties entered into a binding contractual agreement addressing the ownership and control of evidentiary privilege.  VBF argues it is the owner of the withheld documents, and that the agreement is not dispositive.  VBF asserts the documents have always been VBF's property.  The Founders disagree stating that § 7.16 of the agreement specifically prohibited privileged communications from being passed to or claimed by VBF in this situation.

### A. Undisputed Aspects of the Case and Background Principles of Law

First, the parties to this proceeding have already agreed that the Retained Privileged Materials should be turned over to whichever party has an ownership interest in the communications.  Jackson Walker stands ready to deliver the Retained Privileged Materials to whichever party has the right to possess them. Order Mot. Protective Order, ECF No. 15.

Further, the parties do not dispute that control of a corporation's attorney-client privilege ordinarily passes to the new owners when a corporation changes ownership.  This default rule is well-established in Supreme Court case law. Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 348-49 (1985). The Court begins with this assumption and that VBF maintains ownership of its privileged communications.  The real question is whether the Series A Agreement does anything to alter the status quo.

## B. The Series A Agreement

### 1. Choice of Law

As a preliminary matter, VBF briefly disputes the applicability of Delaware law to this case. While VBF is correct that Delaware law does not apply to the general questions of privilege raised in this case, Delaware does apply to any interpretation of the Series A Agreement. Section 7.2 of the Agreement is explicit: "This Agreement shall be governed by the internal laws of the State of Delaware without regard to the conflict of laws or rules of such state." Series A Agreement, Exhibit A, § 7.2. VBF raises no argument attacking the validity of this choice of law provision, so § 7.2 is controlling on the choice of law question insofar as any contract interpretation is concerned.

### 2. Interpretation

In interpreting § 7.16 of the Series A Agreement, VBF encourages the Court to interpret the disputed clause, quoted in full above, in light of the following language in the first sentence of the section:

> It is acknowledged by each of the parties hereto that the Company and Parent have retained Jackson Walker LLP (the 'Legal Counsel') to act as counsel in connection with the transactions contemplated hereby and that the Legal Counsel has not acted as counsel for any other Person in connection with the transactions contemplated hereby and that no party to this Agreement or Person has the status of a client of any of the Legal Counsel for conflict of interest or any other purposes as a result thereof.

Series A Ag., Ex. A, §7.16.  VBF then stresses that the ownership shifting of

privileged communications described later in that section is only "as applicable."

Id.  VBF argues that the recognition at the beginning of the section proves that the

parties understood all privileged communications would remain with VBF.

Founders, on the other hand, ask the Court to focus on the specific language

of § 7.16, which states that ownership and control of any **privileged**

**communications** regarding the Series A Agreement should be distributed among

the Parent, Company, Affiliates, and Management Persons.  Series A Ag., Ex. A,

§7.16.  Founders stress that the Agreement specifically prevents the privilege over

these communications from falling into any investor's hands, and that the practical

effect of VBF gaining the privilege rights over their objection would be to deliver

these rights to Alder (investors) in direct violation of the agreement.

Founders assert that the relevant contract provision was meant to take

advantage of Delaware case law encouraging the use of contracting power to

preserve privilege for current ownership in the event of a buyout or merger.  Great

Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLP, 80 A.3d 155, 160-

61 (Del. Ch. 2013).  The Eighth Circuit has specifically noted the requirements for

contract interpretation under Delaware law:

> Delaware follows 'traditional principles of contract
> interpretation,' including giving 'effect to the plain
> meaning of a contract's terms and provisions when the
> contract is clear and unambiguous.' … A contract term is

> not ambiguous 'simply because the parties do not agree
> upon its proper construction. Rather, a contract is
> ambiguous only when the provisions in controversy are …
> fairly susceptible of different interpretations or may have
> two or more different meanings.' … The contract must be
> construed as a whole, not by looking at terms in isolation.
> … 'The true test is what a reasonable person in the position
> of the parties would have thought [the contract language]
> meant.'

Gateway Customer Solutions, LLC v. GC Servs. Ltd. P'ship, 825 F.3d 502, 505

(8th Cir. 2016) (internal citations omitted); see also Gosiger, Inc. v. Elliott

Aviation, Inc., 823 F.3d 497, 501 (8th Cir. 2016) (setting out a similar analysis

under Iowa law); Restatement (Second) of Contracts § 203(a) (1979).  This Court

applies these principles to the language of § 7.16.

The disputed provisions are two different sentences of § 7.16.  The first

provides a general provision regarding ownership and control of privilege and

client confidentiality rights.  Series A Ag., Ex. A, §7.16.  The second is more

specific in its treatment of privileged communications, and only applies "in the

event that the Company becomes an Affiliate of any Investor or multiple

Investors."  Id.  The two sentences of § 7.16 deal with substantially the same

subject matter—who owns/controls the privilege—but addresses it in different

ways depending on the circumstances.  The Court finds that this structure was

intended to create two separate regimes regarding ownership of privileged

communications related to the Series A Agreement.  The first sentence controls

generally.  The second sentence provides a different method of dealing with

privilege if "an Affiliate of any Investor or multiple Investors."  Id.  The Court first

needs to determine which of the two methods controls the ownership of privileged

communications related to the Series A Agreement.

The key question is whether VBF has become an "Affiliate" of Alder—

thereby triggering the second method.  The Series A Agreement defines "Affiliate"

as:

> with respect to any specified Person, any other Person
> who, directly or indirectly, controls, is controlled by, or is
> under common control with such Person, including,
> without limitation, any general partner, managing
> member, officer or director of such Person or any entity
> now or hereafter existing that is controlled by one or more
> general partners or managing members of, or shares the
> same management company with, such Person.

Id. at § 1.5(b).  The Agreement further defines "Person" as "any individual,

corporation, partnership, trust, limited liability company, association or other

entity."  Id. at § 1.5(jj).  In ordinary language, for the purposes of this dispute, VBF

became an affiliate of Alder if it came to be under the control of Alder, "directly or

indirectly."  Id. at § 1.5(b).

The Court finds Alder became the controlling shareholder of VBF after

Alder took advantage of its rights under the Warrant Agreement to purchase

additional stock.  After that, Alder began pushing out other investors.  It eventually

became the sole shareholder of VBF.  As such, the Court finds that VBF became

an "affiliate" of Alder.  The second sentence of § 7.16 thus controls ownership of

the privileged communications related to the Series A Agreement.

The second sentence of § 7.16 (full section stated above) specifically states

that:

> **in the event that the Company becomes an Affiliate of any Investor** or multiple Investors, **as to all communications** between the Legal Counsel and the Company, or among the Legal Counsel, the Company, the Parent, their Affiliates and/or the Management Persons **prior to the Closing that relate** in any way **to the transactions contemplated** by this Agreement and the other Transaction Agreements, the **attorney-client privilege**, the expectation of client confidence and all other rights to evidentiary privilege **belongs to** Parent or any specific Affiliate or **Management Person who receives a communication**, as applicable, **and shall not pass to or be claimed by the Company** or any Subsidiary.

Id. at § 7.16 (emphasis added).  As Founders rightly point out, the key language

states privilege rights are controlled by the entity which "receives a

communication."  Id.

VBF's reliance on the "as applicable" language in the last part of that

sentence is misplaced.  The Company is omitted as a potential holder of the

privilege rights entirely.  Id.  VBF cannot be the "applicable" owner of any

communications.  Id.  The explicit nature of this exclusion clause, held up against

the generic nature of the ownership-transferring language, shows that VBF cannot

claim ownership of any communications covered by § 7.16.

VBF's argument that the statement at the beginning of § 7.16 somehow
recognizes the company as the sole owner of all privileged communications is
fatally flawed.  Reading the Series A Agreement in this way would be to ignore
chunks of the contract.  The Court must give "a reasonable, lawful, and effective
meaning to all terms" in the contract, if possible.  Restatement (Second) of
Contracts § 203(a) (1979); Gateway Customer Solutions, 825 F.3d at 505 (citing
O'Brien v. Progressive N. Ins. Co., 785 A.2d 281, 287 (Del. 2001)).  If the first
sentence of § 7.16, recognizing that VBF was Jackson Walker's only client in
connection with the Series A Agreement controls everything, then the remaining
§ 7.16 is superfluous and/or no meaning.  VBF simply advances no alternative
interpretation of what the disputed provision could mean in that context.  It is not
up to this Court to discover one.

The Founders' interpretation gives the best effect to the intent of the parties.
Section 7.16 was intended to protect the Founders in case of a corporate
takeover—to preserve their right to assert attorney-client privilege over these
communications.

VBF makes an additional argument that Founders' interpretation of § 7.16 is
absurd because it would allow a non-client of Jackson Walker to assert that
communications between Jackson Walker and its client were privileged from the
client itself.  This characterization grossly oversimplifies the nature of corporate

13

attorney-client privilege.  When the client is a corporation, management or

ownership of the client could change frequently.  Choosing to protect former

manager's communications from the new management is far from absurd.  It is in

fact exactly what VBF and its managers at the time did in § 7.16—which is fully

consistent with and supported by Delaware law.

### 3.  Applicability of Great Hill

VBF next argues that, even if Founders' interpretation of § 7.16 is accurate,

the Delaware case law allowing for previous company ownership or management

to maintain control of certain privileged communications, via contract, in the event

of a takeover is inapplicable here.  VBF notes that the Series A Agreement was not

a merger contract, like those dealt with in Great Hill Equity Partners IV, LP v. SIG

Growth Equity Fund I, LLP, and cases following it.  Great Hill, 80 A.3d at 160-61;

see also S'holder Representative Servs. LLC v. RSI Holdco, C.A. No. 2018-0517-

KSJM, 2019 WL 2290916, at *1, *3 (Del. Ch. May 29, 2019).  VBF also asserts a

privilege-shifting provision in the agreement here cannot be effective because the

Founders maintained control of VBF after closing the Agreement, and Alder only

gained control of VBF around one year later.  Essentially, VBF argues that: (1) the

Series A Agreement was not a merger agreement, (2) because it was not a merger

agreement, the logic of Great Hill does not apply to the contract, and (3) because

Great Hill does not apply to this contract, the provision is invalid under Delaware

law.  While the Court agrees with VBF's first premise here, it does not agree with the others.

The logic of Great Hill does not turn on the contract being a merger agreement.  Great Hill was premised on two key points: (1) the frequency of such provisions in ownership transfer practice, and (2) significant literature advising transactional attorneys to negotiate and draft contracts for ownership changes with control of pre-ownership attorney-client communications kept in mind.  Great Hill, 80 A.3d at 160-61.  Nothing in these rationales suggests that approval of these provisions by Delaware courts is limited to merger contracts.  In fact, one of the articles quoted by Great Hill specifically notes that sellers' attorneys should negotiate for their clients to maintain control over pre-sale attorney-client privilege "regardless of whether the acquisition is structured as an asset transaction, a merger, or a sale of stock."  Id. at 161 n.29 (quoting M & A Jurisprudence Subcommittee, Mergers and Acquisitions Committee, ABA Section of Business Law, *Annual Survey of Judicial Developments Pertaining to Mergers and Acquisitions*, 64 Bus. Law. 433, 463 (2009)).  This Court rejects VBF's attempts to artificially narrow the scope of Great Hill.

### 4.  Application of Interpretation to Ownership Dispute

VBF also argues against Founders claim of ownership or right to assert privilege on communication covered by § 7.16.   It is undisputed that the Founders

qualify as "Management Persons" under this definition.  Founders have a claim to

ownership of the Retained Preserved Materials under the second part of § 7.16.

VBF argues, however, that Founders cannot necessarily claim ownership of every

communication covered by § 7.16, because "Management Persons" are not the

only entities who may claim ownership of the privileged communications under

the disputed clause.  If a Founder was the one to initially receive the

communication, that Founder is the "applicable" "Management Person."  If the

recipient of the privileged communication was not one of the Founders, however,

VBF argues then the communication is owned by either the non-Founder recipient,

if they were themselves a "Management Person," or the Parent or an Affiliate, "as

applicable."  Id.

It appears some of the communications here were in fact made to non-

founder managers.  Those non-founder managers have the right to assert the

privilege.  They are not, however, parties to this dispute.  Thus, the Court is left

with two options here: (1) exclude any communications not received by a Founder

from coverage under § 7.16, notwithstanding the comprehensive scope of the

provision, or (2) adhere to the final line of the section's disputed provision, which

states that the privilege rights in these communications "shall not pass to or be

claimed by the Company or any Subsidiary."  Id. at § 7.16.  Given the strength and

clarity of this language barring VBF from claiming privilege over these

communications, the Court finds that the latter option best gives effect to the intent of the parties. The Court finds that Founders are the only conceivable "applicable" parties who may claim ownership of the privileged communications covered by § 7.16—even the communications which a Founder did not personally receive.

### C. VBF's Remaining Objection to Founders' Assertion of Privilege

VBF has also argued the Founders waived any privilege by leaving some of the communications on VBF servers when ownership of VBF transferred to Alder. This argument is inapplicable here. This dispute concerns ownership of the allegedly privileged communications. Consideration of the effectiveness of the actual assertion of privilege by Founders is unnecessary to resolve the ownership dispute. The more appropriate forum to determine the effectiveness of the privilege assertion and discoverability of the communications is the U.S. District Court for the Northern District of Texas, the site of the ongoing litigation between VBF and Founders. This Court's power to determine what is estate property should not be used to make an end run around the Northern District of Texas' authority to resolve questions of evidence in that litigation.

### D. Communications Outside the Scope of the Series A Agreement

VBF also asserts that even if the Founders own and control the privilege, several of the communications in the Retained Privileged Materials are **entirely** beyond the scope of the Series A Agreement. VBF claims that several of the

withheld communications have nothing to do with the stock-related Agreement at all. The Court agrees with VBF on this single point.

To the extent that any of the Retained Privileged Materials are not covered in any way by § 7.16 of the Series A Agreement, the attorney-client privilege over those communications is owned and controlled by VBF. Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343 at 348-49. The relevant part of § 7.16 encompasses: "all communications between the Legal Counsel and the Company, or among the Legal Counsel, the Company, the Parent, their Affiliates and/or the Management Persons prior to the Closing that relate in any way to the transactions contemplated by this Agreement and the other Transaction Agreements." Series A Ag., Ex. A, § 7.16. This scope contains four requirements: (1) it covers only communications, (2) the communications need to have been made between or among two or more of the covered entities, (3) the communications need to have been made before the date of the Agreement's closing, and (4) the communications need to "relate in any way to the transactions." Id.

The parties do not dispute that all the Retained Preserved Materials are communications, satisfying the first requirement. The third requirement is also satisfied by all the Retained Preserved Materials. Founders assert, and VBF does not dispute, that the Series A Agreement Closing occurred on July 8, 2016. The

last of the Retained Preserved Materials is dated July 6, 2016. Therefore, all the

Retained Preserved Materials meet the timing requirement. This leaves only the

second and fourth requirements: that the communications be among certain

covered entities and that the communications relate to the transactions.

As to the covered entities, the Agreement defines "Legal Counsel" as

Jackson Walker LLP, the "Parent" as "VeroBlue Farms Inc., a Canadian

corporation," and the parties have only identified the Founders as "Management

Persons." Id. at 1. Accordingly, the Series A Agreement covers communications

between Jackson Walker and its employees, VBF and its employees, the Canadian

VeroBlue Farms and its employees, and Founders. Any communication within the

Retained Preserved Materials which a person outside of this group was party to

should be withdrawn from the Retained Preserved Materials and handed over to

VBF.

As to the fourth requirement, the communication must relate "to the

transactions contemplated by this Agreement and the other Transaction

Agreements." Id. at § 7.16. The "other Transaction Agreements" referenced by

this line are defined as "the Registration Rights Agreement, the Stockholders

Agreement, the Parent Preferred Share Purchase Agreement, the Parent

Shareholders Agreement, the Voting Agreement, the Option Agreement, the

Penalty Rights Agreement, the Employment Agreements, the Indemnification

Agreements, the Consulting Agreement, the Lead Investor Warrants and the IP

Purchase Agreement." Id. at § 1.5(vv).  Among these, many of the other

Transaction Agreements were executed simultaneously and appended to the Series

A Agreement.  The Registration Rights Agreement was appended as Exhibit G, the

Stockholders Agreement as Exhibit N, the Voting Agreement as Exhibit H, the

Option Agreement as Exhibit B, the Penalty Rights Agreement as Exhibit F, the

Employment Agreements as Exhibit J, the Indemnification Agreements as Exhibit

E, the Consulting Agreement as Exhibit K, and the Lead Investor Warrants—the

Warrant Agreement—as Exhibit O.  Id. at §§ 1.1(b), 1.3(a), 1.5(q), 1.5(gg),

1.5(kk), 1.5(xx), 4.1(i), 4.1(j), "Exhibits" Index.  Two others, the Parent Preferred

Share Purchase Agreement and the Parent Shareholders Agreement, were executed

simultaneously, but considered separate from the Series A Agreement.  Id. at

§§ 1.1(d), 1.5(ee).  Finally, the IP Purchase Agreement was dated June 29, 2016,

and was also distinct from the Series A Agreement.  Id. at § 1.5(v).

Any communications related to any of these agreements is covered by

§ 7.16.  To the extent that any communication within the Retained Preserved

Materials is not related to any of these agreements, that communication should be

withdrawn from the Materials and delivered to VBF.

## CONCLUSION

**WHEREFORE**, Jackson Walker is ordered to withdraw communications outside the scope of § 7.16 of the Series A Agreement, if any, as detailed in subsection "D" of this order, from the Retained Preserved Materials and deliver those communications to VBF.

**FURTHER,** Jackson Walker is ordered to deliver the remainder of the Retained Preserved Materials to Founders.

**FURTHER,** if Jackson Walker removes any of the communications from the Retained Preserved Materials and delivers them to VBF pursuant to this order, Jackson Walker is ordered to produce two updated lists detailing which communications were delivered to VBF and which to Founders.

**FURTHER,** upon delivery of the Retained Preserved Materials to the appropriate parties, Jackson Walker is ordered to file notice of delivery, along with the produced lists, with the Court.  If none of the Retained Preserved Materials were delivered to VBF, Jackson Walker may file notice of that fact in lieu of the delivery lists.

Dated and Entered:

April 24, 2020

_____

THAD J. COLLINS
CHIEF BANKRUPTCY JUDGE